In the first case, Mr. Bells. Good morning, sir. You may proceed. Judge Woolman, and may it please the Court. My name is Tim Bells. I represent Paul Wieland and Teresa Wieland, who are married. They have three daughters. One of them is a minor, 13 years old, and the other two are 19 and 20 years old, respectively. Two months ago, after the briefs in this case were submitted, the United States Supreme Court held that a person who objects on religious grounds cannot be required to provide contraceptive coverage to others. In that case, two corporations... In that case, Hobby Lobby and Conestoga Wood, two employers, objected to providing such coverage to their employees. In this case, Paul and Teresa Wieland object to providing such coverage to their daughters. So the parallel is that Hobby Lobby and Conestoga Wood stand in the same shoes as Paul and Teresa Wieland, and the employees stand in the same shoes as the daughters. The employees are to Hobby Lobby what the daughters are to Paul and Teresa Wieland. Well, that's just not so. I mean, it's not a controlling precedent. This case is not on all fours. And to say it is, is just distracting from the real issues. Well, Your Honor, the Supreme Court on the merits held that RFRA protected a person. In that case, it was a corporation, a profit-making corporation, a commercial corporation, said that it did not have to provide contraceptive coverage to its employees. Now, if that is true, then another person under RFRA, namely Mr. and Mrs. Wieland, should not have to provide contraceptive coverage to their college-age daughters who are away in a university town many miles away. It is as though the federal government had passed an edict that said that parents must provide a stocked, unlocked liquor cabinet in their house whenever they're away for their minor and adult daughters to use. And Mormons came in and objected to that. It is exactly the same situation. It's exactly the same situation as if the federal government mandated that when you send your kids off to college, you have to provide them with a cable subscription and that the cable subscription would have a pornographic channel in it that would be available to your daughters and religious people. So if each person that is insured is able to demand certain coverage, how are insurance companies going to sell policies? Because it's different between the employer and an individual, I think. Well, I have several answers for that, Your Honor. One is we have a history here. Prior to the Affordable Care Act, Missouri had a very progressive system in place by statute. Missouri said if you work for an employer who has contraceptive coverage in the policy for its employees, you can opt out. That is what the Whelans did. The Missouri statute also said if you work for an employer, like it would be Hobby Lobby today, who does not have such coverage, you can opt in and simply pay the additional rider. So everybody's conscience, the employers and the employees, everybody's conscience was taken care of. Now, as to the practicability of this, the Supreme Court in Hobby Lobby, right near the end of Justice Alito's opinion, he addressed the whole question of can you have a viable insurance system that works. We know from the Missouri experience that you can. You can have an opt-out. It's very simple. The computers at the insurance company just block payment for certain things. We all know how that works. So in Hobby Lobby, Justice Alito made it very clear that there was no practical problem there. And I would point out that under Hobby Lobby, you can have very small employers, very small employers with very small plans. We have law offices that have two people in the plan. Well, there are five people in the Wieland family plan. So Justice Alito takes care of the practicability problem, and the Supreme Court in Ocentro really lampooned, which is cited in our briefs, really lampooned the government's argument in this area. And it said that bureaucrats from the beginning of time, as long as there have been bureaucrats, they have said we can't make any exceptions for you because if we make exceptions for you, we've got to make exceptions for everybody. And so they said this just in Ocentro. They said no. RFRA, by its very existence, exists to provide a case-by-case out for people who have religious objections. What is the substantial burden? The substantial burden is the same as it was for Hobby Lobby. And that is it's not that the employees will use the product. It's not that the daughters will use the product. It's that there is, as a matter of conscience, Hobby Lobby could not be ---- But there's a much greater control by a parent than there is by an employer. Here the with or without an explanation to the daughters, all the parents have to do is say, and we expect you to abide by our religious tenets. And then it's a non-event except for whatever few pennies of insurance premium are not being taken advantage of. Well, we all have high hopes for our kids. That is true. We all expect and want them to obey us. But you briefed this as a combination of religious and parental rights. And I'm accepting that and saying that seems to me makes it a much lesser burden than for an employer. Well, even if it were a lesser burden, and I don't believe it is because the interest here in one's daughters is much greater than the interest in employees. And so my ---- But the daughters without insurance can sneak out, if you will, and buy these products over the counter. Or maybe not over the counter, but they can get them. Exactly. And if they do that, the parents do not have a RFRA claim. The problem here is not that the government is supplying contraceptives to the daughters. If the government were supplying contraceptives to the daughters in another way, the parents would not have a RFRA claim. The problem is the government isn't doing that. And, frankly, if the kids sneak out and do it on their own, the parents don't have a RFRA claim then either. The problem here is that the government has dragooned the parents into its scheme of providing these things, and that is what violates the parents' conscience. The same is in Hobby Lobby. The question was not whether the employees were going to use the product. The question is whether, as a matter of conscience, Hobby Lobby could provide the coverage. It was just that simple. And the other thing about Hobby Lobby, it reiterated a longstanding doctrine that none of us in this room today, and certainly not the federal government, can decide what a person's conscience should allow and what it shouldn't allow. The only judge of that is the person who is protected under RFRA. Now, I guess I must have misread the briefs. I thought this appeal was solely about standing, and so far all I've heard about is the merits. Well, I'm happy to talk about standing. Well, that's all. I mean, if you don't win that, we're done. That's correct. We are here about standing. And the first mistake that the judge made in the district court was in finding that the Affordable Care Act, as implemented by the regulations, was not the cause of the injury to Mr. and Mrs. Wieland. Now, clearly it was. We not only alleged that it was, but we established that it was through minutes of the meetings of the Missouri Consolidated Health Care Plan, MCHCP. We established it through communications that were sent to the Wielands from the insurance company, and we established it through affidavits by the Wielands. So not only did we allege that it was the cause, but we also. Why wasn't the Hough decision the proximate cause? The Hough decision was listed as a cause. The federal law was listed as a cause. But either way, it's the Affordable Care Act, because the Hough decision was. No, but it was an appeal. It wasn't challenging. Well, it wasn't for lack of effort, Your Honor. It's taken as a given here. What do you mean? It was appealed? No, I say it wasn't for lack of effort. There were two. Well, if the Wielands and the individual public employee insureds fought like the devil to get the state to appeal what the employees considered an adverse decision, and the state refused to appeal, then that seems to me that makes the case for the district court's ruling. The key causal factor here is the state government, not the U.S. government. Well, that case was brought by the insurance industry against the insurance commissioner for the state of Missouri. And they attacked not the statute that we are claiming, 191.724. They attacked another statute. That more directly applied. I'm sorry? That more directly applied. It applied more directly in this sense, that it empowered the insurance commissioner to enforce it against the insurance industry. And so that was all the insurance industry cared about. In fact, Judge Fleissig, in her opinion, noted in footnote number one that section 191.724 was unaffected by her ruling. She said it was not directly at issue in that case. So she knew that 191.724 was still in effect and did nothing about it, and neither did the plaintiffs, because all the plaintiffs in that case cared about was getting the insurance commissioner off their back. Now, 191.724, the statute that still remains in Missouri, provides for private enforcement and enforcement by the Attorney General of Missouri. So there was no reason. There were two attempts, by the way. I was counsel for one of them. John Sauer was counsel for another one of them. Two attempts to intervene in that case. They were rebuffed by Judge Fleissig, and rather than seek an intervention on appeal, we looked at 191.724 and said that gives us all the protection that we need, should we get an exemption. I'd like to ask a question about standing. What's your actual injury by the Affordable Care Act? Well, the injury is this. The government is holding a gun to our head and saying this. Either you give up your conscience or you give us your money. That's the injury. If Mr. and Mrs. Wieland violate their conscience and continue to have coverage, they give up their conscience rights. If they give up coverage, they will have to pay a fine, and the fine is substantial. It escalates. It's several hundred dollars this year. It will be several thousand dollars in years to come. And if they pay that, they've been injured. So either way, whether their conscience is violated or they pay the fine, they've been injured. What's your closest analogy? Let's see. Are conscientious objectors required to pay taxes? Yes. Even though some of the money goes to fund killing? That is correct. And if you look at the last few paragraphs of Justice Alito's opinion in Hobby Lobby, he addresses that very issue and says that it is not comparable. That as the court found in United States v. Lee, the Social Security case where Amish employers objected, you can't disrupt the tax system. This is not anything like that. We're not trying to tell the federal government how our money that we're giving to it can be spent. What we're trying to do is get out of a fine. That's the way you are. I see you have three minutes left. I would like to reserve the rest of it. You may do so. Thank you. Ms. Klein? Ms. Klein, good morning. You may proceed. May it please the Court, Alisa Klein for the federal government. I'd like to parse out two different types of claims. This relates to standing. The claim that was actually presented to the district court, and the district court found that the plaintiffs did not meet their burden to establish standing. And a different type of claim that was waived was not presented to the district court. I'm actually going to start with the second one because it's important not to blur these two. What counsel referred to as the fine for not having insurance. So this is a reference to the minimum coverage provision that the Supreme Court upheld in NFIB. We also call it Section 5000A. That provision, the people with standing to challenge that provision, like in NFIB, said, I'm uninsured, I want to remain uninsured, but I don't want to pay the tax penalty. And they submitted sworn declarations. That's how they established standing to challenge 5000A. This case is very different. It's not just that the complaint doesn't challenge 5000A. It doesn't say enjoin the government from imposing a tax if we, the Wheelans, are uninsured. It says we are insured. We have minimum coverage under the Missouri Consolidated Health Care Plan. They had it the day the complaint was filed, and they've had it ever since. So there is no risk that they will owe a tax. This might have been different if they had come in with a sworn declaration and said, I'm going to drop my coverage. The only thing standing in the way is the potential tax penalty. Why do they need the sworn declaration? If they had said it in a complaint, clearly that at this stage would have sufficed as well. Typically it was a verbiage. There was nothing in the district court pleadings about the fines? There's one. They cite it. There's a paragraph 56, I believe it was, in which, yes, this is in the complaint. Paragraph 56, appendix 31. It's just in the description, and it says, beginning in 2014, individuals who do not have health insurance will have to pay a penalty. As in Kinder, this court's decision in Kinder, which held that Lieutenant Governor Kinder did not have standing to challenge the minimum coverage provision 5000A, this paragraph merely recites what the provision says. It doesn't connect this information to any alleged injury. So this is not a case, and, in fact, the complaint repeatedly says, we want our daughters to have comprehensive coverage. It does not say we don't want them to have coverage, and even before the minimum coverage provision took effect in January 2014, they remained in the Missouri Consolidated Group Health Care Plan, even though that plan covered contraceptives. So the district court did not commit legal error in failing to address a claim that was never presented to it. If they remain subject to the ACA, do they have the option to drop out of the Missouri plan, as implemented, if you will, in Huff, and find somewhere in the private market the kind of coverage they seek? Okay, so now this is a distinct issue, and there are two points, one which was presented to the district court and the other which was not. What they said to the district court was- You understand my question. Yes. Can they opt out of the Missouri plan and go to the private market and get what they want? The last part is no. That's because of the ACA, right? Yes. So it's not just go uninsured and pay fines. It's that you have no option to remain insured without this burden on what they perceive or allege to be a substantial burden on a relative, right? Okay, so now I'm coming to the way they briefed this to the district court, the way they presented it. And actually, the court probably doesn't have it in front of it, but their last filing in district court, it was a surreply on standing. It's record 35 and dash 2 is their exhibit with a flow chart. And what they say is, we follow the flow chart, and it says, if you give us an injunction, Paul and Terry Wieland obtain contraceptive free coverage from MCHCP. This was the issue the district court addressed. We said, you have not met your burden to show that the MCHCP would actually give you the plan you want. And they could have tried to meet their burden in two ways. They could have said, the MCHCP agrees with us, see, we have a declaration from that. They did not do that. They could have said, and I think the complaint comes close to saying this in paragraph 82, the MCHCP disagrees with us. In which case, they would have had to sue the MCHCP and get a judgment that binds the MCHCP. And what the district court said is, they're a third party, Missouri, the MCHCP. They're not bound by anything I would say about Missouri law in this lawsuit. Now, we've separately explained why we don't think they're reading Missouri law correctly, or more important, why the MCHCP disagrees with the plaintiff's reading of Missouri law. But this court doesn't need to resolve what Missouri law means in order to affirm the district court's judgment, which said, you didn't prove that if I issue an injunction that says the MCHCP doesn't have to include contraceptives, that you'll get the plan that you want. Now, what bothers me on what you're calling the first claim that was presented is the district court's assumption that Huff was forever binding precedent. If Huff is overruled, why don't they have standing? They will then have redressability. What obstacle is left for standing? Okay, so Huff can't be overruled. Can't? No, this is in the record, because Huff became final. The Missouri Insurance Commissioner decided not to appeal. But it can be overruled by a subsequent, I mean, the U.S. Supreme Court can reach out and just say it's overruled. No, Missouri did not elect to challenge it. It implemented it instead. There is no one who could bring the Huff decision to the Supreme Court. This is, I mean, plaintiff's counsel participated in that decision, I assume, lobbied the state. If the 8th Circuit or the U.S. Supreme Court said tomorrow Huff is wrong and said nothing else, why isn't there standing? Because Missouri and the MCHCP, which were parties to Huff, they're bound. But, again, here, let's just look at what the MCHCP itself said. It said in light of the federal court ruling, I mean, referring to Huff, MCHCP must provide contraception and sterilization coverage in all the plans it offers. The MCHCP rescinded the rule that allowed enrollees and group health plans to opt out because of the Huff decision and said there is no longer a state law basis on which to allow the opt out rule. So again, it was their burden to prove that if they got an injunction that permitted this particular third party to give it the plan it wants, that the third party would, in fact, do so. And they did not submit a declaration from the MCHCP. And the submissions they did rely on actually say the opposite. They say, no, we must put all of our enrollees in the same plan. So just briefly, this relates to the merits as well and why this case is different from Hobby Lobby and all the other employer cases. Hobby Lobby, of course, was the employer. And it was the regulated entity. If its group health plan did not cover contraceptives, barring relief from court, it would owe the substantial fines. And so, of course, we never contested standing in the employer cases. And the Supreme Court said, under the specific circumstances, the government needs to make the pre-existing accommodation that it had made available for certain other employers, nonprofit religious organizations. That's a less restrictive alternative that ensures that all the employees get contraceptive coverage. And that is available to for-profit employers as well. There is no case like this one, and no federal statute, no regulation, that would allow an individual plan participant. Mr. Wieland is one of 100,000 participants in the Missouri group health plan to say, you need to tailor the plan so that my premium doesn't cover services that offend my religious beliefs. What's the burden on the government, the ACA plan, of allowing this? It would. Congress was attempting to. I mean, opposing counsel says insurers can do this easily. Well, to be clear, the Missouri Senate Bill 749, which is referring to this, it was in place for a very short time, and it was enacted in September 2012. Now, tell me what the burden on the government's grand scheme is to allow these relatively few opt-outs. Well, that's the point. It's not relatively few. I mean, in Missouri alone it was 10,000, and that was just contraceptive coverage. But there's not a principled basis for saying people who object to having their group health plan cover contraceptive coverage. Now you don't like RFRA. It has to be a principle that HHS can get its hands around, or else it's somehow off the charts. This is exactly what Chief Justice Roberts said in Ocentro. He reaffirmed Lee, where there was just one person saying, I don't want to pay these employee benefits because of my religion, and the Supreme Court said, no, the system as a whole isn't workable if we let people opt out. They didn't look at Mr. Lee in isolation. Ocentro reaffirms Lee and recognizes that there are many contexts in which uniformity will be independently compelling. Just said that wasn't the case for the Controlled Substances Act, that HWASCA was not like heroin, you know, wasn't like all other Schedule I drugs, that there were only 130 members of the religious sect who sought to use HWASCA, that there were special protections in place for the members of the sect, and little risk of diversion. And also said, you know, if any of that changes, government, you can go back to the district court. This is different. This is saying that just categorically, if a person says, I object to, I think, use of the Hepatitis A vaccine, which Hepatitis A is only spread through sexually transmitted disease or drug use. I don't want to give my daughters a plan that includes coverage of the Hepatitis A vaccine. That is analytically the same argument that the Whelans are making here. Well, not unless it's religiously based. Of course, I'm sorry, religiously based. Same thing for, you know, just prevention of sexually transmitted disease. People with treatment. Yes, this is the point, and it was made by Judge Robner in dissent, but there can't be a dispute that we're a cosmopolitan society and different people will have religious beliefs about different health care services. But the essence of group health coverage, and this was one of the things Congress was promoting in the Affordable Care Act, is that you have a uniform set of benefits for the covered group of insured. It's not a tailored, you know, to you and you and you and you, based on religious beliefs or anything else. So this is much more like Lee, where you can't have a system of individualized exemptions than like Ocentra, where the court thought HWASCA can be treated differently. It's not like Lee. I mean, it's not like funding the government. I agree. I'm not saying it's like Lee in that way. Well, it's Congress. Congress has an objective or had a parent objective here that's contrary to its objective in RFRA. And it seems to me that it's for the courts to leave Congress to sort out that conflict. Well, we're making a strict scrutiny argument. What you're talking about is, well, we'll have 10,000 here and 100,000 here, all these opt-outs, and now we won't have what Congress wanted. But Congress wanted the opt-outs in RFRA. No, this is a strict scrutiny argument under RFRA. Congress did not want exceptions no matter what. Congress said only, you know, except where there's a compelling interest and this is the least restrictive means of advancing that interest. So the points I'm making are in the rubric of strict scrutiny. So there, and that's how Lee was decided. So there, yes, of course RFRA contemplates exemptions. That's exactly what the statute is about, but not always. So we could never have a RFRA-less exemption to an environmental statute because that's so compelling that we save the environment. No, it depends. Again, you would look at the particular claim and is there a principled basis for limiting it to that claimant or some small group of claimants. We're looking at the compelling interest of the government. And here it is having a workable system of group health coverage. And you cannot have that if the individual enrollees can say, I need a plan where my premiums don't cover services that offend my religiousness. But that's what happens in the private sector all the time. You go to the insurer and you say, I don't want, the insurer says, here's my package. And the prospect says, I don't want this, this, and this, and I'd like to have that. And the insurer says, I'm sorry, our underwriters don't have that package. And you go on from there. It's not how group health coverage works. A group health plan, the individual employees, they might get to choose standard option or family option, but they don't get to say, I don't need a mammogram, I don't want to cover mammograms, I don't want to cover this. That's not group health coverage. Well, I'll tell you, if they're collectively bargaining, it's not just the employer who decides what the package is. It's the employees collectively. But it's a uniform system. It's not tailored participant by participant. Here we have 100,000 beneficiaries in the Missouri Group Health Care Plan, and there is no precedent for requiring an employer to say, okay, I need to design the plan, you know, potentially 100,000 different ways. Obviously not everyone will have religious beliefs, but at least in theory, 100,000 different ways. That ceases to be group health coverage. And, again, so the fact that the Missouri health care plan isn't a party to this case and wouldn't be bound by anything the district court said is a sufficient reason to affirm the dismissal for lack of standing. So I'm only addressing these merits arguments if the court were to conclude that the plaintiffs met their burden of establishing standing. And there's no standing only because of the limited way it was pled. It's not just that. If they had just pled it to say we challenge 5000A, just said that, that would be like kinder and they wouldn't have established injury in fact. If they had pled it to say we've dropped our health insurance because it now covers contraceptives, that was August 2013, come 2014 we'll owe a fine for being uninsured. We want an exemption from the fine. You don't have to wait until you're fined. No, no, no. I'm not saying it's a pre-enforcement suit, but they filed this in August 2013. If they had said we don't want health, obviously they want health insurance, but faced with the choice between having a plan that covers contraceptives and nothing, we opted to go with nothing. And in six months we'll owe a fine and we want an exemption from the fine. They would have standing. Obviously we would not say they- But the complaint I'm picturing is if we can't have it through the Missouri plan, we want to be able to drop the Missouri plan and get in the private market the insurance with the opt-out we want. And ICA, you've said this morning, would say no, if you do that, A, you won't get the product, and then you'll be fined. So you're saying- If they- If that's the case that you're saying is not here and therefore we don't have to- Correct. We don't have to do is write it out of this opinion. Yes, because they neither said to the district court, and if you look at the flow chart, they neither said if we can't get it from the MCHCP, we want to be able to try from another insurer with the benefit of an injunction. The pragmatist tells me that that narrow a decision gets the government nowhere. Why don't you concede standing and fight the merits? No, because we really don't- Understand, there's a reason they don't want to give up what they call the valuable employer benefit. But I guarantee you there will be plaintiffs who will. I actually- There were dozens and dozens of employer suits. This is the only employee suit. There's one district court proceeding in which the employer and a couple employees are both present, but this is the only case. And the reason that they don't want to give up their employer coverage is that it would be much more expensive, even if they could get the plan they want, to then go to the individual market because they would not be eligible for subsidies. They want subsidized coverage from the Missouri Group Health Plan. They just want Missouri to give them a different plan. And you say we could not grant that relief even if we were so disposed in the light of the law. We can't grant an injunction against a non-party, in other words? The court- They never suggested this court could compel a non-party, and the problem was they didn't prove that if they just got an injunction that would allow Missouri to give them the plan they want, that Missouri would do so. They didn't- The simple way would have been to put in a declaration from the Missouri plan saying, yes, we'll do this if they get the injunction. I don't know if they asked- Representative Wieland asked for support from the Missouri plan and didn't get it or didn't even ask. Obviously, plaintiff's counsel can answer that. Unless the court has further questions, I'll rest on our brief. Very well. Thank you. First of all, I would like to put one thing to rest. The second prong of our redress argument was vigorously argued before the district court. We argued two things for redress. One, and it's in the flow chart. My friend did not continue reading on the flow chart, which was provided to the district court. The flow chart under injunction says the first choice is Paul and Terry Wieland obtain contraceptive free coverage from Missouri Consolidated Health. That's the first option. If that happens, Paul and Teresa Wieland are very happy, and that will happen under 191.724, which forbids discrimination against people making claims like the Wielands. But then the flow chart goes on, and this summarizes arguments that we had made, all of which are referenced in footnote number six on page eight of our reply brief, and also in our letter, 28J response letter filed last Friday on September 5th. We put in there all of the places in every single brief, and, of course, as counsel noted in the complaint, this question of if we can't get what we want from MCHCP, then what happens? And we argued all of that to the court. Now, the next thing in the flow chart is even if, for sake of argument, insurers refuse to provide the Wielands with a contraceptive free plan, the Wielands may choose then not to provide their daughters with coverage at all. But if they do that, they'll be fine. So the government has given the Wielands two choices, and we spell this out in the flow chart. I don't understand what you just said. You just said what the government wants. What was the second option for relief? I thought you were talking about relief that you asked the district court to provide. What we asked the district court to provide was very simple. I don't understand the relief in this. What's the nature of the second option? What's the relief? The relief is that if we were forced into a position where the only way that we could be consistent with our conscience, if we were forced into the position of just dropping coverage altogether, then the relief that we're asking for, which is that this mandate can't be enforced against us, the contraceptive mandate can't be enforced against us. Is that 5,000A? Well, it's really the contraceptive mandate as applied to us through the individual mandate. In other words, it's like this. In real terms, what is the nature of it? What's the difference between your language and what counsel says is 5,000A? 5,000A is the individual mandate. 5,000A says, to use an example, you must buy a Buick. Now, the contraceptive mandate says the injunction says if you drop your insurance for this reason, you can't be fined. The injunction says that the mandate cannot be enforced against us, the same as it was in annex medical. Okay, I don't understand that. That to me is, I mean, this is a case with thousands of pages and years now of history. I don't understand what you're saying when you just say the mandate can't be enforced. I mean, you can throw that out on the air, and it's a sound bite, but it doesn't mean anything to me. Well, the mandate as it currently stands is that every insurance policy that is available to the Whelans has contraceptive coverage in it. I understand that. They are looking for a way out. What would the injunction say? The injunction. I'm a Rule 65 guy. I want to know the precise nature of the preliminary injunction that you think clients are entitled to under what you're calling Option 2. The injunction would say that it would enjoin the government from requiring that the Whelans obtain for themselves and provide dependents with health coverage that includes coverage for contraception. That's one. Two, it would enjoin the government from requiring that health coverage provided to the Whelans or through them to their dependents would include contraceptive coverage. And three, and we took this right out of the language of Annex Medical from a year and a half ago, it would enjoin the government from requiring that a group health plan or health insurance issuer, like MCHCP, when providing health care coverage to Paul Whelan or Teresa Whelan and their dependents, include such contraceptive coverage. So it doesn't require. Where were you reading from? I'm reading from the conclusion of our brief. And we put that in the conclusion of the reply brief also. So those are the three things. And, frankly, that language was picked up directly from the Annex Medical preliminary injunction that was. That was your appellate brief. What did this flow thing that the district court saw? The district court saw Part A of that. We did not spell out to the district court that we wanted protection for the insurance company, too. We simply asked the district court to enjoin the government from requiring the Whelans to obtain for themselves and provide dependents with health care coverage that includes coverage for contraception. That covers it. Very well. That concludes your argument. The case is now submitted, and we will take it under consideration.